(93 Misc. Rep. 154)

### PESCHKE v. WRIGHT et al.

(Supreme Court, Appellate Term, First Department. January 7, 1916.)

1. BROKERS ☞35—STOCKBROKERS—MARGIN TRADE—CONVERSION.
   Plaintiff prior to July 30, 1914, when the stock market closed, bought, through defendants, certain shares of stock to be carried on a 10 per cent. margin, and on July 30th, when his margin was less than 10 per cent. of the market value of the stock, and after demand failed to furnish additional margin, and defendants, under a rule of the exchange that members could sell only to relieve the necessities of themselves or their customers and after giving a list of the securities for sale to an exchange committee and could not sell at prices less than the closing price of July 30, on August 17th, sold the stock under such rule. *Held* that, even if

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

plaintiff had agreed that the transaction between himself and defendants was to be governed by the rules of the exchange, such special rule was not binding on him, that the rule itself did not attempt to allow brokers to sell without authority of their clients, that the sale was in effect a private sale contrary to the law permitting a sale for any unpaid balance only at a public sale after due notice, and hence was a conversion.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. § 27; Dec. Dig. ☞35.]

**2. BROKERS ☞38—CONVERSION OF CUSTOMER'S STOCK—MEASURE OF DAMAGES.**

Upon a broker's conversion of his customer's margined stock by an unauthorized sale to realize any unpaid balance, the measure of damages is the difference between the price at which the stock was sold, and the highest market price within a reasonable time thereafter; as, after the customer has had a reasonable time to buy back his stock, the broker cannot be held for further loss of speculative profits.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. §§ 31–36; Dec. Dig. ☞38.]

**3. BROKERS ☞38—STOCKBROKERS—CONVERSION—DAMAGES.**

Where plaintiff's margined stock was bought through defendants as brokers prior to July 30, 1914, when the stock exchange closed, and after demand for additional margins was sold to realize the unpaid balance under an exchange rule permitting sales at prices not less than those of the closing day, instead of at a public sale after due notice, so as to amount to a conversion, and it appeared that after the sale on August 17th defendants offered to replace the stocks without loss upon margin, and that there were dealers in stocks and actual dealings and private transactions, etc., so that, while the exchange was closed, plaintiff could have repurchased his stock for less than the price obtained at the unauthorized sale, there was no damage shown, and hence plaintiff could not recover for the conversion.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. §§ 31–36; Dec. Dig. ☞38.]

**4. EVIDENCE ☞323—MARKET PRICE—EXCHANGE—SALES.**

In determining the market price of commodities of fluctuating values, dealt in upon a recognized exchange, the courts receive as evidence proof of the actual sales made on such exchange, which sales are the best possible evidence of market value.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1214–1217; Dec. Dig. ☞323.]

**5. BROKERS ☞38—CONVERSION—ACTION FOR DAMAGES—BURDEN OF PROOF.**

Plaintiff, suing his broker for the unauthorized sale of his margined stock, had the burden of showing his damages by evidence of the market value of such stock within a reasonable time; three months thereafter not being a reasonable time.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. §§ 31–36; Dec. Dig. ☞38.]

Appeal from Municipal Court, Borough of Manhattan, Fourth District.

Action by Max Peschke against William May Wright and Howard Slade, doing business under the firm name of Wright, Slade & Company. From a judgment for plaintiff, defendants appeal. Reversed, and complaint dismissed.

Argued November term, 1915, before LEHMAN, BIJUR, and FINCH, JJ.

Ehlermann, Hale & Wright, of New York City (Swinburne Hale, of New York City, of counsel), for appellants.

Benjamin L. Brandner, of New York City (C. Bertram Plante, of New York City, of counsel), for respondent.

LEHMAN, J. [1] The plaintiff prior to July 30, 1914, bought through the defendants, as brokers, certain shares of stock. At the time he purchased these shares the parties agreed that the stocks should be carried on a 10 per cent. margin. On July 30th, the money deposited by the plaintiff was considerably less than 10 per cent. of the market value of the securities. The plaintiff failed upon demand to give the defendants additional margin, and the defendants then had an absolute right to sell the plaintiff's stock which they held as security for any unpaid balance, but they could make such sale only at public sale after giving due notice.

It appears in this case that the defendants are members of the stock exchange, and after July 30th the stock exchange was closed until December 12th. In the interim the members of the exchange were notified that:

"The special committee of five rules that members of the exchange desiring to buy securities for cash must send a list of same to the committee in clearing house, 55 New street, giving the amount of securities wanted and the prices they are willing to pay.

"No offers to buy at less than the closing prices of Thursday, July 30, 1914, will be considered. Members of the exchange desiring to sell securities but only in order to relieve the necessities of themselves or their customers must send a list of same to the committee in clearing house, 55 New street, giving the amounts of securities for sale.

"No prices less than the closing prices of Thursday July 30, 1914, will be considered."

The record fails to disclose who the "special committee of five" are, or under what authority they presumed to rule. However, for the purpose of this appeal, I think we may assume that the committee of five was a duly appointed committee authorized to make rules binding upon the exchange, and that the members of the exchange were bound by their rulings. It follows that the defendants could not make any sale of the plaintiff's stock except in the manner set forth in the notification unless they were willing to break the rules of the exchange. On August 17th, the defendants sold the plaintiff's securities at the closing prices of July 30th. The sale was made by sending an offer to sell to the clearing house, which then notified the defendants that another stock exchange house had sent an offer to buy at the same price. In my opinion, even if the plaintiff had received due notice that defendants were about to sell his stock, this method of sale was not an appropriate method of disposing of stocks held as security for a debt. The law requires that such sales be made at a public sale, and this sale was certainly a private sale. Moreover, while this ruling or rule of the committee of five was binding on the defendants as members of the exchange, it was not binding on the plaintiff. There is no direct evidence in this case that the plaintiff ever agreed that the transaction between him and the defendants was to be governed by the rules of the exchange; but, even if we assume

that the parties did make such an agreement, this rule does not provide that brokers may sell out their customers' securities held by them as collateral in this manner, nor is it a rule governing sales on the exchange. It merely provides that no sales may be made by members of the exchange in any manner. except as therein provided, but it does not attempt to give the brokers any right to sell in this manner without the direct authority of their clients. On the contrary, the rule expressly provides that such sales may be made "only in order to relieve the necessities of themselves or their customers." It is therefore unnecessary to consider whether a rule which did attempt to give members of the exchange so unusual a power would be binding on previous clients of the brokers. The trial justice therefore correctly held as a matter of law that this sale of plaintiff's securities constituted a conversion.

[2, 3] The real difficulty in the case arises over the question of whether the plaintiff has shown any damages. Undoubtedly the measure of damages in such a case is the difference between the price at which the securities were sold and the highest market price within a reasonable time thereafter. The trial justice has held that a reasonable time included the period after the stock exchange opened on December 12th till February 1st, and gave judgment for the value of the shares at the highest price reached on the stock exchange during that period. The plaintiff undoubtedly had the right to wait a reasonable time before replacing his securities, but, under ordinary circumstances, it would require no argument that a period of almost six months after notice of the conversion is not a reasonable period. A broker guilty of a technical conversion must reimburse the injured party for his actual damages, but, after the injured party has had a reasonable opportunity to buy back his securities, the broker cannot be held for further loss of speculative profits. The plaintiff now claims that until the stock exchange was reopened there was no open market for the purchase of his securities, and until that time he had no opportunity to buy back his stock. The situation created by the war and the consequent closing of the stock exchange was novel, and naturally there is no precedent to be found in the earlier cases directly covering this situation. It seems to me, however, that logically the plaintiff's contention must be overruled.

It is true that after the stock exchange closed on July 30th there was no building in this city devoted to the sale of securities, and in a sense there was no public market for corporate securities. It does not follow, however, that there was no market for them. There is no building or specific place in this city which constitutes a public market for shoes or textiles or countless other articles which are constantly being bought and sold, yet no person would contend that there is not a market and even an open market for such articles. A market price is not necessarily made by public auctions or public sales, but it is made by the agreement of ready buyers and willing sellers, and a market exists in the legal sense wherever ready buyers and willing sellers have an opportunity to come to an agreement. If the plaintiff had a reasonable opportunity to purchase back the securities which

the defendants converted before the opening of the stock exchange from sellers willing to sell at a lower price than the price at which the defendants sold his stock, then the plaintiff has suffered no damage by the conversion. The evidence to my mind clearly shows that the plaintiff had such opportunity. Aside from the method of sale still permitted to members of the exchange, the evidence shows that there was a market on the curb for the sale of securities, and at this market there were daily offers of the securities owned by the plaintiff, at prices lower than those obtained upon the unauthorized sale. It seems to me quite immaterial whether we call this market "unofficial" or "unauthorized," or even an "outlaw" market, if in fact it was a market where a ready buyer could obtain stock from willing sellers. The plaintiff, however, argues that it does not appear that he knew of the existence of such a market. It seems to me that this contention is also unsound. He received notice on August 17th that the defendants had sold his stock at the closing prices of July 30th. On October 6th the defendants sent him a letter stating that:

"If you will send us your check for $500 as margin, we will replace these stocks in your account without any loss to you."

The plaintiff therefore had notice, first, that his stock had been sold at some place on August 17th, and, second, that in some way his stock could be repurchased without loss on October 6th. Even if the plaintiff knew little about stock transactions, he certainly had notice, not only that there were persons in this city who were dealers or brokers in stocks, but also that actual dealings in stocks were being consummated. The plaintiff had no right to close his eyes deliberately to these facts. If the plaintiff had gone to a dealer or broker in such stocks, he would have learned that there was market open to all not bound by stock exchange rules at which he could have bought back his stock at a lower price than the closing prices of July 30th, or, if he preferred dealing with stockbrokers under the protection secured by the rules of an established exchange, he would have learned that transactions in stocks were being conducted through the stock exchange clearing house at the closing prices of July 30th. The law makes no distinction in regard to the measure of damages upon a conversion of stock and a conversion of other commodities. In all cases the damages are fixed by the market value of the commodity converted. In ordinary cases the market value is determined at of the date of the conversion, but in all cases the law attempts to reimburse the injured party for his proximate damages, and, in cases where there are special circumstances such as ordinarily exist in the case of a conversion of securities of fluctuating value which are held as security for a debt, the proximate damages are determined by the market value at such time as would afford the injured party opportunity to buy back the securities within a reasonable time after notice of the conversion. See Baker v. Drake, 53 N. Y. 211, 13 Am. Rep. 507; Corn Exchange Bank v. Peabody, 111 App. Div. 553, 98 N. Y. Supp. 78.

[4, 5] In determining the market price of commodities of fluctuating value dealt in upon a recognized exchange, the courts receive as evidence proof of the actual sales made on such exchange, for these

prices are the best possible evidence of market value. Where there are no sales made on the exchange, the rule of damages still remains the same, but the market price must be established by other evidence. In either case the plaintiff has the burden of showing his damages by evidence of the market value within a reasonable time. In this case the plaintiff has produced evidence only of the market value months thereafter, and has therefore failed in his proof, while the defendants have affirmatively proven that the market value during the intervening period was always at or below a price at which the plaintiff would have bought back his securities without loss.

. It follows that the judgment should be reversed, with $30 costs, and complaint dismissed, with costs.

FINCH, J., concurs.

BIJUR, J. I concur on the ground that plaintiff has not been damaged. I assume the learned judge below to have found that there was a conversion by the defendant of plaintiff's stock by the sale of August 17, 1914, at prices which both counsel appear to think have been proved as follows: Interborough, 52; Tennessee copper, 24¾; Utah copper, 46.

Plaintiff admitted that he received a copy of defendant's letter of that date notifying him of the sale enclosed in one of September 18, 1914. It appears that, during a reasonable time after he received the notice of the sale at the prices named, the market price of these stock was never higher than the price at which they had thus been sold. He could therefore have replaced them at a considerably lower figure, but refrained from doing so, or even from making any inquiry in regard thereto. Under the circumstances, plaintiff has suffered no damage for which a recovery can be had.